FILED
2019 May-28 AM 09:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| S. MARIE VERNON, } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | Case No.: 1:18-cv-496-ACA |
| } | |
| CENTRAL ALABAMA } | |
| COMMUNITY COLLEGE, } | |
| } | |
| Defendant. } | |

## MEMORANDUM OPINION

This matter is before the court on Defendant Central Alabama Community College's ("CACC") motion for summary judgment. (Doc. 39).

Plaintiff S. Marie Vernon worked for CACC as the Director of Accounting from January 2014 until July 2016. Ms. Vernon alleges that CACC terminated her employment because she is female. The remaining claim in this action is one for gender discrimination under Title VII against CACC. (*See* Docs. 13, 19, 26).

As explained below, Ms. Vernon has not demonstrated that CACC's legitimate, non-discriminatory reason for terminating her employment is pretext for unlawful gender discrimination, and she has not presented other circumstantial evidence from which a jury could infer that gender animus motivated her termination. Therefore, the court **WILL GRANT** CACC's motion.

I.   **BACKGROUND**

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

CACC is one of 24 institutions that comprise the Alabama Community College System. (Doc. 40 at 3, ¶ 2). Dr. Susan Burrow was appointed as Interim President of CACC on February 26, 2013, and she was confirmed President in October 2015. (Doc. 40 at 3, ¶ 1). On January 2, 2014, Dr. Burrow hired Ms. Vernon as CACC's Director of Accounting. (Doc. 40 at 4, ¶ 4; Doc. 40-9 at 12; Doc. 40-10 at 1). Ms. Vernon worked in CACC's business office, where she supervised nine employees. (Doc. 40 at 4, ¶ 6; Doc. 44-2 at ¶ 3; Doc. 44-4 at 37). Ms. Vernon reported directly to Richard Hawkshead, CACC's Executive Vice President and Chief Financial Officer. (Doc. 40 at 4, ¶ 6; Doc. 40-10 at 1).

When Ms. Vernon arrived at CACC, the business office was undergoing "a major overhaul and a rebuilding and rehabilitation process" in light of a November 2012 audit report from the Alabama Department of Examiners of Public Accounts. (Doc. 44-5 at 9). Employees in the business office were "unhappy," and Dr. Burrow admits that Ms. Vernon was placed in a "challenging situation." (Doc. 44-4 at 15). According to Ms. Vernon, she inherited a "disgruntled staff" (doc. 40-11

at 7), and "a business office culture that was toxic, recalcitrant, insubordinate, and absent" (doc. 44-2 at ¶ 6). Ms. Vernon claims that every time she attempted to document problems with staff, Mr. Hawkshead and Dr. Burrow "wanted [the] office to complete the financial statements and then address the difficult staff." (Doc. 44-2 at ¶ 16; *see also id.* at ¶ 17). Despite challenges with her staff, Ms. Vernon helped improve CACC's financial reporting. (Doc. 44-2 at ¶¶ 18–19; *see* Doc. 40-5 at 2, 7).

On February 16, 2015, Mr. Hawkshead completed an annual evaluation for Ms. Vernon. (Doc. 40-5 at 2–4). Mr. Hawkshead evaluated Ms. Vernon in a number of individual categories and provided a numerical ranking between 0 and 5 for each category. (*Id.*). Mr. Hawkshead found that Ms. Vernon "consistently excels in job performance" or "performs at a level above job requirements" in a number of categories, including quality of work, quantity/efficiency of work, initiative, dependability, and attendance. (*Id.* at 2–3). Mr. Hawkshead indicated that Ms. Vernon needed improvement in the areas of areas of decision-making, attitude, and communication skills. (Doc. 40-5 at 2–3; Doc. 40-1 at 4–7).

With respect to decision-making, Mr. Hawkshead noted that

> [g]enerally, Marie makes good judgment calls based on her knowledge and I have the utmost confidence in her but as a first time middle manager is still struggling to find the right balance in making decisions when dealing with staff. She is sometimes overzealous in her attempts to control her staff which can be counter-productive and stressful (for both her and her staff).

3

(Doc. 40-5 at 2).

Concerning Ms. Vernon's attitude, Mr. Hawkshead stated that "Marie has struggled with some undependable and uncooperative staff that sometimes negatively impacts her attitude, however the stressful environment and workload also affects her ability to maintain a positive mental attitude." (Doc. 40-5 at 3). Mr. Hawkshead explained that Ms. Vernon communicated effectively with most personnel, but he commented that she "is frustrated by staff which is reflected in her communication style and impacts her ability to maintain a smooth and composed conversation." (*Id.*). Mr. Hawkshead also stated that Ms. Vernon's "desire to control and related emotions sometimes get the best of her and is occasionally reflected in her communication style." (*Id.*).

On November 4, 2015, Dr. Burrow and CACC Human Resources Director, Tina Shaw, discussed CACC staff complaints about Mr. Hawkshead and Ms. Vernon. (Doc. 40 at 6–7, ¶ 12; *see* Doc. 40-5 at 5–6). Ms. Shaw's notes from the meeting indicate that employees expressed a number of concerns regarding Mr. Hawkshead's and Ms. Vernon's leadership of the CACC business office. (*See* Doc. 40-5 at 5–6).

Relevant to Ms. Vernon's claim in this case, Ms. Shaw's notes state that Mr. Hawkshead engaged in the following conduct that employees reported as offensive:

4

- Rubbing necks and touching backs of some staff members
- Stating "What's wrong with ----, she got crotch rocket?"
- Stating "Marie doesn't date, she needs to get her a sugar daddy"
- Stating "You are going to blind somebody with those rhinestones on your jeans"
- Stating "Marie is OCD"

(Doc. 40-5 at 5). Ms. Shaw's notes also state that Mr. Hawkshead is known as a "prankster." (*Id.*). The notes list several examples, including Mr. Hawkshead's writing the words "eat me" on a banana. (*Id.*).

Ms. Shaw's notes identify the following "leadership concerns" with Ms. Vernon:

- She talks abrasively and condescending[ly] to staff
- Creates a very "tense" environment to work in
- She argues with staff
- She sends other staff members into the restroom looking for individuals
- Roams hallway looking for staff when they are away from desk
- Goes outside looking and checks parking lot for cars
- Walks around the unit upon arrival in the morning making notes of who is in their office and who is not
- Treats staff like "kids"; does not respect staff and their positions
- There is a joke in the area, which person is Marie today . . . "Marie or Shirley" (Shirley is her first name)
- Fixated on irrelevant issues that cause disruption in the unit
- Verbalizes to staff she is stressed
- One day last week, abruptly grabbed her purse in front of staff and said "I need to leave and find a better attitude" . . . . leaving staff startled
- Some employees have reported she approaches them later in the day and apologizes for her behavior
- When staff report the "pranks" to her, she comments it is [Mr. Hawkshead]

5

(Doc. 40-5 at 5-6). Ms. Vernon denies that she engaged in this conduct, and when Ms. Vernon tried to talk with Dr. Burrow about the allegations contained in Ms. Shaw's November 4, 2015 meeting notes, Dr. Burrow refused to speak with her. (Doc. 44-2 at ¶¶ 13, 23–24, 30).

On December 2, 2015, Mr. Hawkshead notified CACC of his intent to resign. (Doc. 40 at 7, ¶ 13). Ms. Shaw asked Mr. Hawkshead to conduct an evaluation on any direct subordinates prior to his planned departure on December 31, 2015. (*Id.*). Mr. Hawkshead prepared a written performance evaluation for Ms. Vernon on December 22, 2015. (Doc. 40-5 at 7; Doc. 40-6 at 1–4; Doc. 40-10 at 8–9). The comments associated with 13 of the 15 areas of evaluation are identical or substantially similar to those contained in the February 2015 evaluation. (*Compare* Doc. 40-5 at 2–4 *with* Doc. 40-5 at 7 *and* Doc. 40-6 at 1–4). Mr. Hawkshead again gave Ms. Vernon high marks with respect to her work product and work ethic. (Doc. 40-5 at 7; Doc. 4-6 at 2). Like the February 2015 evaluation, the December 2015 evaluation explained that Ms. Vernon needed improvement in the areas of decision-making, attitude, and communication skills. (Doc. 40-6 at 1–3; Doc. 40-10 at 9–11). Mr. Hawkshead also found that Ms. Vernon needed improvement in her cooperation with team members. (Doc. 40-6 at 2).

In January 2016, Dr. Burrow hired Lisa Thacker to replace Mr. Hawkshead, and Ms. Thacker became Ms. Vernon's direct supervisor. (Doc. 40 at 8, ¶ 15). Ms. Vernon claims that Ms. Thacker was "antagonistic" and "unsupportive." (Doc. 44-2 at ¶ 15).

Ms. Vernon completed a professional development plan on April 27, 2016. (Doc. 40-6 at 5–6; Doc. 40-7 at 1–3). When asked to describe her effectiveness in personnel supervision, leadership, talent development, and succession planning, Ms. Vernon explained

> I inherited a disgruntled staff. It has taken them a long time to gain some trust in my abilities and in my care for them, but progress has been made in this area. I continue to work on good communication with them and the office environment is getting better for me and the staff.
>
> I have made mistakes in leading this staff and I have tried to learn from those mistakes. I am not perfect and I know I may not always do my job perfectly, however, will strive for excellence in all that we do for the business office and CACC.

(Dc. 40-7 at 2).

On May 9, 2016, as part of CACC's routine and annual evaluation process, Ms. Thacker performed an evaluation of Ms. Vernon. (Doc. 40 at 8, ¶ 17; Doc. 40-11 at 1). Unlike Mr. Hawkshead, Ms. Thacker found that Ms. Vernon needed improvement in areas of evaluation associated with Ms. Vernon's individual job performance. (Doc. 40-7 at 4–6). Like Mr. Hawkshead, Ms. Thacker noted similar concerns with Ms. Vernon's attitude, decision-making, cooperation,

7

communication skills, and attitude. (*Id.*). For example, Ms. Thacker stated that the business office does not operate as a team and that Ms. Vernon monitors subordinates' work "too closely on a day to day basis rather than focusing on training and analyzing results." (*Id.* at 5). Ms. Thacker also explained that Ms. Vernon's subordinates complained that she "raises [her] voice and acts in an intimidating manner." (Doc. 40-7 at 5).

On June 21, 2016, Dr. Burrow provided a 15-day notice to Ms. Vernon that her employment was terminated effective July 6, 2016. (Doc. 40 at 9, ¶ 10; Doc. 40-8 at 5). According to Dr. Burrow, her decision to terminate Ms. Vernon's employment was based on Ms. Vernon's annual performance evaluations and staff complaints about her. (Doc. 40 at 9, ¶ 10; Doc. 40-1 at 1, ¶ 24). On September 21, 2016, CACC hired Steven Hays, a male, to take Ms. Vernon's position. (Doc. 40 at 9, ¶ 20).

## II. ANALYSIS

CACC moves for summary judgment on Ms. Vernon's claim for gender discrimination in violation of Title VII.[1] In deciding a motion for summary

---

[1] In her response in opposition to CACC's motion for summary judgment, Ms. Vernon argues that CACC discriminated against her because of her age in violation of the ADEA. (Doc. 44 at 12–14). Ms. Vernon's brief in opposition to summary judgment also refers to sexual harassment and a hostile work environment. (Doc. 44 at 6). Document 19 is the operative complaint. It does not contain an age discrimination claim. (*See generally* Doc. 19; *see also* Doc. 26 at 6–7 & n.2). In addition, the court dismissed Ms. Vernon's hostile work environment claims and all other claims except Ms. Vernon's Title VII gender discrimination claim against CACC. (Doc. 26). The court does not consider Ms. Vernon's arguments concerning age discrimination or

8

judgment, the court must first determine if the parties genuinely dispute any material facts, and if they do not, whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A disputed fact is material if the fact "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Under Title VII, it is unlawful for employers to terminate an individual because of her sex. 42 U.S.C. § 2000e-2(a)(1). Where, as here, a plaintiff relies on circumstantial evidence to establish discriminatory intent for purposes of a Title VII claim, a district court may use the *McDonnell Douglas* analytical framework to evaluate the sufficiency of the plaintiff's evidence. *Flowers v. Troup Cty., Ga. School Dist.*, 803 F.3d 1327, 1335–36 (11th Cir. 2015).

Under this burden-shifting framework, "a plaintiff first must make out a prima facie case of discrimination that 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *Id.* at 1336 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). If a plaintiff presents a prima facie case, then the burden shifts to the defendant to articulate a non-discriminatory basis for the employment action at issue. If the defendant

---

hostile work environment because there is no operative claim for age discrimination or hostile work environment, and "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017) (internal quotation marks omitted).

carries this light burden, then the burden returns to the plaintiff to prove that the defendant's stated reason for its conduct is pretext for intentional discrimination. *Id.*

Although it is one tool for examining evidence of discriminatory intent, "'the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion' in Title VII cases." *Flowers*, 803 F.3d at 1336 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "The critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Id*. (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328). A convincing mosaic of circumstantial evidence may be sufficient to allow a jury to infer that discriminatory intent motivated an employment decision. *Lockheed-Martin Corp.*, 644 F.3d at 1328. "Whatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'" *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328). A "plaintiff retains the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Flowers*, 803 F.3d at 1336 (internal quotation marks omitted).

1. <u>Ms. Vernon's Prima Facie Case</u>

To establish a prima facie case of discriminatory discharge under Title VII, a plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) [s]he was replaced by a person outside h[er] protected class or was treated less favorably than a similarly-situated individual outside h[er] protected class." *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

CACC does not explicitly concede that Ms. Vernon can establish the first three elements of her prima facie case, but neither does CACC address those elements in its brief in support of its motion for summary judgment. (*See* Doc. 41 at 11–12). Instead, CACC argues that Ms. Vernon cannot establish the fourth element of her prima facie case because she cannot show that CACC treated her differently than a similarly-situated male employee. (*Id.*). Even if that is the case, Ms. Vernon has established the fourth element of her prima facie case because CACC replaced her with a male. (Doc. 40 at 9, ¶ 20). Accordingly, the court examines whether circumstantial evidence creates a question of fact regarding whether CACC's legitimate, non-discriminatory reason for Ms. Vernon's termination is pretext for unlawful gender discrimination.

2. CACC's Legitimate Non-Discriminatory Reason and Pretext

An employer's burden to produce evidence of a legitimate non-discriminatory reason for its employment decision is "exceedingly light." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (internal quotation marks omitted), *abrogated on other grounds by Lewis v. City of Union City, Ga.*, 918 F.3d 1213 (11th Cir. 2019). The proffered reason need only be "one that might motivate a reasonable employer." *Chapman v. Al Transport*, 229 F.3d 1012, 1031 (11th Cir. 2000) (en banc). After reviewing Ms. Vernon's performance evaluations and employee complaints about Ms. Vernon, Dr. Burrow terminated Ms. Vernon's employment based on poor performance. (Doc. 40 at 9–10, ¶¶ 19, 24). This is a legitimate, non-discriminatory reason. Therefore, to survive summary judgment, Ms. Vernon must demonstrate that this proffered reason is pretext.

In evaluating pretext, the court must determine "whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employee's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997) (internal quotation marks omitted). A plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing

that the employer's proffered explanation is unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).

Ms. Vernon argues that CACC's reason for terminating her employment is pretext for two reasons. First, Ms. Vernon points to CACC's decision to order Mr. Hawkshead to evaluate Ms. Vernon after Dr. Burrow and Ms. Shaw learned about Mr. Hawkshead's gender-discriminatory comments and conduct. (Doc. 44 at 15). According to Ms. Vernon, "[t]o allow a supervisor who has a proven record of discriminatory behavior to evaluate a member of a protected class is inconsistent with basic fairness and decency." (*Id.*).

The court is "not in the business of adjudging whether employment decisions are prudent or fair." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). The court's "sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Id.* Mr. Hawkshead's comments and behavior suggest that he personally might have been biased against women, but under the circumstances of this case, Mr. Hawkshead's actions do not support an inference that CACC terminated Ms. Vernon because she is a woman. Mr. Hawkshead did not make the decision to terminate Ms. Vernon's employment, and in fact, he was no longer employed at CACC when Dr. Burrow decided to fire Ms. Vernon. (*See* Doc. 40 at 7–9, ¶¶ 13, 15, 19). Statements from non-decisionmakers can constitute circumstantial evidence of intentional

discrimination if they raise an inference that the employer improperly based its employment decision on an employee's membership in a protected class. *See Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla.*, 256 F.3d 1095, 1107 (11th Cir. 2001), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008). Here, however, there is no evidence that Mr. Hawkshead's gender-discriminatory conduct is connected with Dr. Burrow's decision to terminate Ms. Vernon's employment or CACC's employment practices generally. *Cf. id.* (non-decisionmaker's statement that employer "would continue to promote on the basis of color" constituted circumstantial evidence of discrimination because it raised inference that decisionmakers "improperly based their decisions on race" instead of legitimate criteria).

Ms. Vernon submits that CACC "utilized the evaluations provided by Mr. Hawkshead to justify her termination." (Doc. 44 at 11). To the extent Ms. Vernon implicitly raises a cat's paw argument, this argument fails. Under the cat's paw theory, an employer may be liable for the discriminatory acts of a supervisor who is not a final decisionmaker if the "supervisor performs an act motivated by [gender] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

Assuming without deciding that gender animus motivated Mr. Hawkshead's negative performance evaluations of Ms. Vernon, there is no evidence in the record to suggest that Mr. Hawkshead intended his acts to cause an adverse employment action. Mr. Hawkshead "communicated no adverse employment decision regarding [Ms. Vernon] to [Dr. Burrow] for h[er] review; nor did []he recommend that [Dr. Burrow] take action against [Ms. Vernon]." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). In addition, Ms. Vernon has not demonstrated that any discriminatory animus behind Mr. Hawkshead's evaluations, and not the underlying performance issues identified in the evaluations, actually caused CACC to terminate her employment. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999). Accordingly, the cat's paw theory of liability does not assist Ms. Vernon.

Second, Ms. Vernon maintains that the fact that she was "evaluated three times in less than two and half years and negatively assessed for the behavior of employees in her charge who were known to be incompetent, unhappy and antagonistic . . . creates an issue of fact which should be determined by a jury." (*Id.*) (internal quotation marks omitted). The court disagrees. Ms. Vernon's evaluations acknowledge that Ms. Vernon encountered uncooperative staff, but Mr. Hawkshead and Ms. Thacker assessed Ms. Vernon's ability to respond to and interact with her staff. (*See generally* Doc. 40-5 at 2–4; Doc. 40-5 at 7; Doc. 40-6

15

at 1–4; Doc. 40-7 at 4–6). If Mr. Hawkshead and Ms. Thacker gave Ms. Vernon low marks in part because of her employees' attitudes or behavior, nothing in the record suggests they did so because Ms. Vernon is female. Thus, Ms. Vernon has failed to identify sufficient circumstantial evidence to allow a reasonable juror to conclude that the proffered reason for her termination was not what actually motivated CACC to fire her.

3. Other Circumstantial Evidence

In addition to the two arguments she makes regarding pretext, to carry her burden of establishing a question of fact regarding discriminatory intent, Ms. Vernon argues that when she began her employment in the business office, "she was faced with forty-three [] audit findings which were caused by the inaction of the previous administration," and through her efforts, "[t]he audit findings were reduced . . . to less than ten." (Doc. 44 at 10). Ms. Vernon also claims that Mr. Hawkshead allowed the employees that she supervised "to undermine her leadership, offered no assistance with the employees and did little to assist in reducing the audit findings." (*Id.*). Finally, Ms. Vernon submits that the third evaluation upon which Dr. Burrow relied to terminate her employment was completed "by a supervisor who ha[d] known and supervised" Ms. Vernon for only five months. (Doc. 44 at 11). This evidence in no way suggests that gender animus motivated Dr. Burrow's decision to fire Ms. Vernon. "Title VII is not a

shield against harsh treatment at the workplace." *Nix v. WLCY Radio/Rahall Commc'ns.*, 738 F.2d 1181, 1187 (11th Cir. 1984) (internal quotation marks omitted), *abrogated on other grounds by Lewis v. City of Union City, Ga.*, 918 F.3d 1213 (11th Cir. 2019). It is obvious that Ms. Vernon feels that she was treated unfairly and not given the credit she believes she was due for her work at CACC, but the court cannot remedy the wrong unless Ms. Vernon is able to show that CACC treated her differently because she is female. Ms. Vernon has not satisfied her burden.

## III. CONCLUSION

For the reasons stated above, the court **WILL GRANT** CACC's motion for summary judgment and **WILL ENTER** judgment in favor of CACC on Ms. Vernon's Title VII gender discrimination claim. The court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this May 28, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE